WILLIAM HENDERSON *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Springfield May 10, 1888.*

1. CRIMINAL LAW—*enticing away an unmarried female for purpose of prostitution or concubinage—elements of the offense.* Under section 1 of the Criminal Code, making it a crime to entice or take away an unmarried female of chaste life and conversation from her parents' house, or wherever she may be found, for the purpose of prostitution or concubinage, or to aid or assist therein, the *gravamen* of the offense is the purpose or intent with which the enticing or taking away is done.

2.  The offense, if committed at all, is complete the moment the subject of the crime is removed from the power and control of her parents, or of others having lawful charge of her, whether any illicit intercourse ever takes place or not. Subsequent acts are only important as affording reliable evidence of the original purpose or intent of the accused.

3.  SAME—*concubinage—whether the relation exists.* Where a single woman consents to unlawfully cohabit with a man generally, as though the marriage relation existed between them, without any limit as to the duration of such illicit intercourse, and actually commences cohabiting with him in pursuance of that understanding, she becomes his concubine,—or, in other words, his "kept mistress."

4.  No great length of time or long continued illicit intercourse is necessary to the establishment of the relation of concubinage. That relation, like marriage, may be contracted or assumed in a day as easily as in a year. Any remarks in *Slocum* v. *The People,* 90 Ill. 274, to the contrary, are not approved.

5.  SAME—*"prostitution"—"concubinage"—sense in which the words are used in the statute.* The words "prostitution" and "concubinage" in section 1 of the Criminal Code, relating to the abduction of unmarried females for the purpose of prostitution or concubinage, were used by the legislature · in their general or popular signification.

6.  SAME—*determining the intent.* As a general rule, the safest way of judging of one's intention about a particular matter, is to look to his acts, rather than his professions respecting it, especially when they are found to be in conflict.

7.  PRACTICE—*time to object—obscure expressions in an instruction.* Where the trial court, on its own motion, instructs the jury, if any explanation of terms used in the instruction is desired, the party should ask for it. In the absence of any such request, a judgment will not be reversed because the court fails to define the meaning of the terms used in an instruction, and this more especially when the terms are not technical terms, but are words in common and general use.

WRIT OF ERROR to the Circuit Court of Champaign county; the Hon. C. B. SMITH, Judge, presiding.

Messrs. JOHN M. & JOHN MAYO PALMER, and Messrs. PATTON & HAMILTON, for the plaintiffs in error.

Mr. GEORGE HUNT, Attorney General, for the People.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

At the September term, 1887, of the Champaign circuit court, the grand jury returned into open court an indictment, founded upon the first section of the Criminal Code, against William Henderson, John Henderson, Carroll Shutt and Julia Shutt. The first count charges that the defendants, on the second day of September, 1887, unlawfully and feloniously enticed and took away one Joanna Carman, then and there being an unmarried female of chaste life and conversation, from her parents' house, for the purpose of prostitution. In another count of the indictment the defendants are charged with enticing and taking away the prosecutrix for the purpose of concubinage. In other respects the latter count is like the first. Upon consideration of the evidence, in the light of the charge of the court, the jury returned a verdict of guilty against all the defendants, fixing their respective terms in the penitentiary as follows: William Henderson's at eight years, Carroll Shutt's at two, John Henderson's at one, and Julia Shutt's at one. A motion for a new trial having been made and overruled, the court pronounced sentence and judgment upon the defendants, in conformity with the verdict. The question to be considered is, whether the finding of the jury, and the judgment and sentence of the court, are warranted by the law and the evidence.

The defendants William and John Henderson are brothers. Julia Shutt is their sister, and the wife of Carroll Shutt. The prosecutrix, Joanna Carman, is the daughter of Benjamin F. and Eliza Carman, and at the time of the alleged abduction was about fifteen years old. The Shutts and Carmans lived near each other in the city of Urbana, and had been on visiting terms some three years prior to this occurrence. William Henderson, the principal in the affair, is a barber by trade, and a dissolute, drunken character, who spent most of his time in the vicinity of Urbana, and was frequently at Shutt's house,

39—124 ILL.

with whom his brother, John, was temporarily stopping at the time in question. About the first of July, 1887, William Henderson commenced making calls at Carman's house and paying his attentions to the prosecutrix. It was not long before Mrs. Carman, her mother, became acquainted with his dissolute habits and bad reputation, and forbade his coming to her house any more. He nevertheless managed to meet with her daughter at Shutt's and other places, and finally, by means of promises, threats, etc., induced her to consent to an elopement, for the purpose, as he put it, of getting married, and she, doubtless, so understood it. In settling the preliminaries, he told her that they could start from Mrs. Shutt's, his sister's, —"that she would not give them away." They accordingly did start from there on the evening of the second of September, a little after dark. John Henderson, about dusk of that evening, went to Carman's house, where he found Joanna out in the yard, and, without attracting the attention of any of the family, told her that William was ready to go, and was up on the corner of the street, waiting for her. After joining him on the street, the two repaired to Shutt's house, where all four of the defendants met together and talked over the matter of the elopement, which was accelerated by the approach of Joanna's sister, upon discovering which, John remarked, in the presence of them all: "Will, I tell you what is the matter: you want to hurry up and get out of here, because here comes Stell, and she is long-nosed, and will give it away." It was understood by all present, that the two were to go to the Doyle House, in Champaign City, but a short distance from Shutt's, for the purpose, as was stated to her, of waiting for the night train, but nothing seems to have been said about where they were to go beyond there, or their ultimate plans or purposes. On arriving at the hotel, about eight o'clock, instead of sitting up for the train, or ordering separate rooms, and making arrangements to be called for the train, Henderson engaged a single room, "for," as he put it, "himself and wife," and the two were

at once conducted to it, where they lodged together as husband and wife. They remained at the hotel together, under that assumed relation, until next evening about five o'clock, when they returned afoot to Shutt's house, John Henderson going back with them. They reached Shutt's house some time before night. John had visited them at the Doyle House three times that day,—in the morning, at noon, and in the evening,—and told them that they would have to keep hid or they would be found. After their return to Shutt's, on Saturday evening, Joanna's father came to the front gate, and was engaged in a conversation with Carroll Shutt. Joanna was, at the time, in the back yard, though she recognized her father's voice, and heard him make the remark, "That girl is in this town, and I am going to find her." The parties, however, were not speaking sufficiently loud to enable her to understand anything else that passed between them. While this conversation was going on, Mrs. Shutt, and John and William Henderson, were most of the time out in the back yard with Joanna, all of whom knew of the conversation, and that the object of Carman's call there was to find his daughter. Occasionally John Henderson would go round in front and participate in the conversation for a short time, and then return and caution the parties to speak lower, or they would be discovered. After Carman had left, and about eleven o'clock at night, the party out of doors, being informed the coast was clear, went into the house, whereupon Mrs. Shutt brought some bedding into the back room adjoining the kitchen, and threw it down on the floor, telling William to fix his bed, and he and Joanna were left in that room by themselves, where they slept together until about two o'clock in the morning, when John Henderson, Mrs. Shutt, her daughter and mother, rushed into the room where William and Joanna were sleeping, and told them to jump up,— that her father and mother, with the police, were at the gate. Being thus warned, they hastily retreated through a door leading to the rear of the building, whence, by means of an alley,

they made their escape, John accompanying them to the fair grounds, but a short distance from the house. The latter, on parting with them, remarked, "I will bet, before to-morrow night I will be taken up for this." The two fugitives, after parting with John, proceeded afoot to Tolono, thence to Sadoris, thence to Ivesdale, and thence towards Bement. On Sunday night they lodged in a cornfield within about a mile and a half of that place. Monday morning Henderson went into the town, and brought back with him a young man, who, by his direction, took Joanna to Bement, and left her at a hotel, where, in a short time afterwards, she was taken into custody by an officer. Henderson, who had gone to town by another route, was soon afterwards discovered and placed under arrest.

This statement presents the substance of the prosecutrix' testimony, and we do not think its force or effect is materially impaired by the other evidence in the record.

The section of the statute above referred to, and on which the indictment is founded, is as follows : "Whoever entices or takes away any unmarried female of chaste life and conversation, from her parents' house, or wherever she may be found, for the purpose of prostitution or concubinage, and whoever aids and assists in such abduction for such purpose, shall be imprisoned in the penitentiary not less than one nor more than ten years."

The elements which go to make up the offense created by this section of the statute are so plainly and concisely expressed, that it would be useless to attempt to make any change in the language used, with the hope of presenting them in a more concise or perspicuous form. Indeed, the section, in both these respects, may be regarded as a specimen of model legislation.

But two questions are made in the brief of counsel for plaintiffs in error, and they will be considered in the order made.

It is contended, first, that the evidence fails to show that the prosecutrix was enticed and taken away from her father's

house for the purpose either of prostitution· or concubinage, but, on the contrary, for the purpose of marriage, only,—in other words, the enticing and taking away is confessed, but the purpose or intent with which it is alleged to have been done is denied. While the proofs satisfactorily show that the prosecutrix left her father's house with the intent and expectation of being married to the accused, and while it is equally clear that he professed to be taking her away for the purpose of marrying her, yet we agree with the jury and court below that that was not his real intention. On the contrary, we are of opinion that his expressed purpose to marry her was a mere subterfuge and pretense, to enable him to get her completely within his power, that he might the more certainly and effectually overcome all scruples of modesty and virtue, and finally induce her to surrender her person and honor as a willing sacrifice to his licentious passion and beastly lust. That marriage was not seriously intended on his part, we think is shown by the decided weight of testimony. As a general rule, the safest way of judging one's intentions about a particular matter · is to look to his acts rather than his professions respecting it, especially when they are found to be in conflict, as was the case here. The night train upon which Henderson pretended he wanted to leave, did not reach the depot in Champaign City until about one o'clock in the night. It was in the light of the moon, and not a very long walk over to the depot, which was but a few steps from the Doyle House. Had his intentions been honorable, he would most likely have remained with his intended wife at his brother-in-law's until near train time, and then walked over to the depot,—at least this would have been the more natural and appropriate course to pursue. So far as the record shows, neither the place nor time of the marriage was pre-arranged, nor even so much as talked about, either before or after their departure. The evidence shows that Henderson personally knew that he could not get a license . authorizing their marriage in this State, without some one ·

committing perjury, and the conclusion is warranted, from the evidence, that he was destitute of means to defray their traveling expenses out of the State, or anywhere else. Although his bill at the Doyle House was only one dollar, he was not able to pay that, and was compelled to pledge his satchel and contents, consisting of a few old razors, as security for the amount, and they were still unredeemed at the time of the trial. It is reasonable to suppose his impecunious condition was known to his brother and the Shutt family, and the fact that John went over to the Doyle House Saturday morning, and called upon the prosecutrix at her room, is a circumstance tending strongly to show that he did not expect them to leave on the night train. All day Saturday, when not in or about the Doyle House, the accused was out on the streets, drinking and spreeing around, as usual. At five in the evening, as heretofore seen, he and the prosecutrix, accompanied by John, returned to Shutt's in broad daylight, and deliberately took up their quarters there, both occupying the same bed at night, in utter defiance of law, decency and public morals. Is there anything in all this, tending to show that his object in taking her from the home of her parents was to make her his wife, rather than his kept mistress? If there is, we confess we have not been able to discover it.

As before indicated, the *gravamen* of the offense is the purpose or intent with which the enticing and abduction is done, and hence, the offense, if committed at all, is complete the moment the subject of the crime is removed beyond the power and control of her parents, or of others having lawful charge of her, whether any illicit intercourse ever takes place or not. Subsequent acts are only important as affording the most reliable means of forming a correct conclusion with respect to the original purpose and intention of the accused. It is with this view we have gone so minutely into the history and details of the case as we have.

The remaining point to be considered is, whether there is any material error in the charge of the court to the jury, for which the case should be reversed.   The record shows that the court gave a general charge to the jury, on its own motion, and that no other instructions were asked or given.   One of the objections taken to the charge is, that the court should have explained to the jury what is meant by the terms "prostitution" and "concubinage," as they occur in the statute.   The court was not asked to give an explanation of these terms, and no reason is perceived why it should have done so in the absence of such request.   At any rate, it would be going much further than we are prepared to go, to reverse the judgment on that ground.   The words in question are in general use, and we have no doubt that they were used by the legislature in their general or popular signification.   They are in no sense words of art, or technical terms, and if it were apprehended that they would not be correctly understood by the jury, counsel should have prepared an instruction defining the words, and submitted it to the court, to be ruled upon in the usual way. It is but a fair presumption that the jury understood the words in the sense in which they are used in the statute, and that they were used by the court, in its charge, in the same sense.

It is said that "nothing short of continuous and regular illicit intercourse would constitute concubinage," within the meaning of the statute, and *Slocum et al.* v. *The People,* 90 Ill. 274, is cited in support of the statement.   Conceding this to be so, it does not follow that the court erred in neglecting to give an instruction that was not asked for.   With respect to the case cited, it was clearly decided right.   Yet we think there are certain expressions in the opinion which were not necessary to a decision of the case,—that if applied to cases under the statute that might be suggested, would need modification.   If by the above statement it is intended to assert that any great length of time or long continued illicit intercourse is necessary to the establishment of that relation which results in concu-

binage, the proposition, in our judgment, is unsound. The relation which gives rise to the disreputable state of woman indicated by that term, may, like that of marriage, be contracted. or assumed in a day as easily as in a year. When a single woman consents to unlawfully cohabit with a man generally, as though the marriage relation existed between them, without any limit as to the duration of such illicit intercourse, and actually commences cohabiting with him in pursuance of that understanding, she becomes his concubine, or, as it is usually expressed in modern times, "his kept mistress," which amounts to the same thing. So we hold in this case, that when the heartless libertine, by his seductive arts, or other means, induces his confiding or intimidated victim, as the case may be, to abandon home and the wholesome restraints of parental authority, to accompany him whithersoever he may see proper to take her, without limit as to time or place, for the purpose of submitting to his licentious embraces and ministering to his unbridled lust, he clearly brings himself within the provisions of the section of the statute we are now considering, and subjects himself to the punishment therein denounced. In short, we do not think any of the objections pointed out to the charge of the court materially affected the result, or are, in any view, of so serious a character as to require a reversal of the judgment. Upon the whole, we think the charge was fully as fair to the accused as it ought to have been. In our opinion, a clear case is made out against William Henderson, and if it be possible to make out a case of aiding and assisting in the commission of an offense, it must be admitted that it has been done in this, as to the other defendants. The evidence not only shows them guilty, but demonstrates that they knew at the time they were violating the law.

The judgment will be affirmed.

*Judgment affirmed.*