THE STATE OF KANSAS v. EDGAR OVERSTREET.

1. CONCUBINAGE — *Information.* An information, otherwise good, charging E. O. with the abduction of a female under the age of eighteen years from her parents for the purpose of concubinage, is not vitiated by the addition of the words "for the purpose of having sexual intercourse with him, the said E. O."

2. EVIDENCE, *Sustains Verdict.* Where the evidence establishes that the defendant, a married man, and a girl of the age of sixteen, occupied a club-room together, being the only persons in the building, going there about midnight and remaining until nearly daylight the next morning, and that before and since that time he had been paying assiduous attentions to the girl, giving her presents, taking walks with her, and meeting her alone and at his own house when his wife was away, and that he wrote letters to her, all without the consent of her parents, it is sufficient to sustain a verdict under a charge of abducting a female under the age of eighteen years for the purpose of concubinage.

3. LETTERS, *When Admissible in Evidence.* Letters without date or signature, but shown to have been in the handwriting of the defendant, and bearing within themselves and by comparison with other letters actually received by the girl seduced, that they were intended for the said girl and were written when he was criminally intimate with her, are admissible in evidence against the defendant, although there was no positive proof that they had been actually received by the girl.

*Appeal from Ellis District Court.*

THE opinion contains a sufficient statement of the case.

*A. D. Gilkeson,* for appellant.

*L. B. Kellogg,* attorney general, and *W. R. Nicholson,* county attorney, for The State.

Opinion by HOLT, C.: The defendant was charged in an information, which, omitting the formal parts, was as follows:

"One Edgar Overstreet did then and there feloniously, one Artie Toms, a female under the age of eighteen years, to wit, of the age of sixteen years, take away from A. R. Toms, her father, and M. E. Toms, her mother, they, the said A. R. Toms and M. E. Toms then and there having the legal charge of the said Artie Toms, without the consent and against the will of the said A. R. Toms and M. E. Toms, for the purpose of concubinage by having sexual intercourse with him, the said Edgar Overstreet."

At the September term, 1889, of the Ellis district court, he was tried, found guilty, and sentenced to imprisonment in the penitentiary for the term of three years; from that judgment he appeals. The testimony introduced at the trial showed that Artie Toms, a girl sixteen years old September, 1888, was living with her parents in Ellis county, and that the defendant was a near neighbor, a married man and father of two children; that there had been an intimacy between Artie and the defendant since midsummer, 1888; the most direct and positive testimony of any flagrant act was in reference to the night of the 17th and 18th of January, 1889, when Artie spent part of the night with the defendant alone in a gambling- or club-room above a billiard hall near her father's dwelling; the first part of that night she spent with a Mrs. Doige, who, with her husband, occupied one part of her father's residence; about midnight Mr. Doige came home from this club-room; when he entered the house the girl arose, went out of doors and into this club-room with the defendant; her father and mother were aroused; her father following and ascertaining where the

girl was, tried to obtain the key of the man who had rented the room, but being unable to get it, he watched the place until nearly six o'clock the next morning, when the defendant unlocked the door at the foot of the stairway leading to this room and let the girl out, who went home, and he, relocking the door, went upstairs again; shortly afterward Mr. Toms went away for a few minutes, leaving some one else to watch the door; while Mr. Toms was away the defendant came down, opened the door, and passed out by a back alley.

Overstreet had been very attentive to Artie for several months prior to January 18. He had given her a number of presents — a guitar, breast-pin, rings, earrings, books, and music — and had also taught her to play on the guitar. He had been in the habit of walking by the house or standing opposite to Artie's window communicating with her by means of signs upon his fingers, supposed to be the deaf-and-dumb alphabet. When he commenced going with her the girl was an obedient and dutiful daughter, and was attending the public schools; but she became disobedient, left school, and when she was sent away to another town Overstreet wrote for her and she came back. He had been remonstrated with by Artie's mother and her two sisters, and at one time agreed to cease going with the girl, but did not keep his promise.

There is quite a volume of testimony showing the opposition of Artie's father and mother to this intimacy between her and the defendant, also the remonstrances of her mother and two sisters. The mother's testimony, which was substantially corroborated by her two daughters, was, that Artie and the defendant were together a great many times both before and after the 18th of January; her mother testified that her attention was first called to his improper actions by others; she then watched him, and found that he would come by the house and make signs, and shortly afterward the girl would leave the house and meet him; at one time the mother followed her daughter up to Mr. Overstreet's house, and saw Artie and the defendant sitting together on the sofa, he with his head close to her shoulder; Mrs. Overstreet was away at

the time; she said that he monopolized her company and kept her away from other young people; when he went out to walk he would meet her; that whenever Mrs. Overstreet was away from home the girl would slip out of the house and go up there; when he came about she would steal out of the house, "and we would miss her, and couldn't find her; she did this hundreds of times, and I'd follow them, and sometimes I'd find them; and that was the way it was all the time."·

There were a number of letters introduced in evidence by the state. The first, exhibit A, was a letter found beside Artie's trunk. The first part of the letter is as follows:

"DEAREST LOVED ONE: Good morning, my little black rascal. I have just gotten up, and it is twenty minutes past three. I say, you had better take a few more lessons from Kinney, and take them regular; I want you to learn me before long, or as soon as we go to Texas. Mrs. Doige didn't say anything to Jen about us last night."

His wife's name was Jennie. Further along in the letter, writing of Mrs. Doige, he says: "I told her to shut up, and then I cussed Mrs. Doige until I went to sleep. We will fool her if she does think she will find anything out." In another part of the letter he says: "Brownwood is where my father lives; it is a nice place to go; you can go there and wait for me. Tell your ma I am not a Texan, but I would not be ashamed of it if I was, for the people in the town I lived in are ten times smarter than the people of Ellis. Well now, don't talk about short letters, for yours is still shorter than mine. You are very sweet, and I love you very much. I will stop now, for I want· to see you. Maybe I will write more when I go up town. Yours forever." The next letter was found behind the looking-glass in Mr. Toms's house; it was addressed "Dearest loved one," and contains a great many terms of endearment, closing with: "I love you, and none but you. I love you if you hate me. You want to fuss, don't you, my sweet little black rascal? Please don't get mad at me, little sweet love. Yours." These letters are without signature, but were identified as being in the handwriting of the

defendant. Then follows in evidence quite a number of letters in the same handwriting, which were found by Mrs. Toms at the defendant's house. She said she knew they had been locked up in Artie's trunk, but had been taken out and were up there. They are full of endearing appellations, and are very fervid in their protestations of affection, and show considerable ingenuity and versatility in the use of pet names. In various parts they refer to "Jen" in. disparaging terms; spoke of her mother slightingly, and of her two sisters somewhat bitterly. The letters were addressed to "Loved one," "Dearest loved one," "Sweet darling angel," "Dearest sweet little loved one," "My darling sweetheart," "Darling Artie," and "Sweet darling." They contained such phrases as: "Darling, will you please forgive me? Yes, forgive me. Yes, love, I would kiss your little foot if you would say please to me." "Sweetest darling Artie: Please destroy this letter as soon as you read it. I love you, little sweet darling, and it is awful hard for me to stay away over here and you over there to talk. You must not get mad at me so much. There, I see the finger; I'm coming." "You are a daisy, and I love you one hundred million steamboats full; and I know that I would like to be over there with you now; I would squeeze you so hard you would say, 'Stop, you old fool, you.'" "I love you, and have not the least love for anyone else; you are my queen, my all." "Oh, darling, how could I get along and not talk with you every day? You don't know how bad it makes me feel. I could kill that old sow for coming. I hate her, the old devil. We must find some way to talk a little, anyway, or we will go to Texas at once. I love you, my own sweet little queen, and I want you all to myself, and I am going to have you, or die trying." And so on, *ad nauseam*.

The provision of the statute under which this prosecution was commenced is § 35 of the crimes act, to wit:

"Every person who shall take away any female under the age of eighteen years, from the father, mother, guardian or other person having legal charge of her person, without

their consent, either for the purpose of prostitution or concubinage, shall upon conviction thereof be punished," etc.

The defendant insists that the information was insufficient; he says that if it had followed the wording of the statute simply, it would have been a good information under § 35, but the addition of the words "by having sexual intercourse with him, the said Edgar Overstreet," limited the scope of the section and precluded the idea of concubinage.  He further objects that the evidence did not sustain the verdict, and that the instructions defining concubinage were misleading and erroneous.  Was the offense described in § 35 charged in the information, or was it vitiated by the addition of the words "by having sexual intercourse with him, the said Edgar Overstreet"?  And was the evidence sufficient to sustain the verdict?  The information, evidence and instructions are consistent with each other, and the objections made by the defendant are fairly in the record; they are practically the same, and what we may say in examining the evidence will decide also the other objections named.

There is not a particle of testimony to show that the defendant kept or boarded Artie Toms at any place, or that he kept house with her, but it is established that he occupied a room alone with her nearly all night of the 17th and 18th of January, 1889.  It is contended by the defendant, however, that even if there was criminal intercourse on that night, yet that act alone would not constitute the offense of concubinage.  He insists that there must have been a cohabitation, a living together as husband and wife, before the crime charged could have been consummated.  The defendant cites a number of authorities to sustain his contention; among others, the case of the *United States v. Cannon*, 116 U. S. 55; but that authority is not exactly applicable to this case.  That decision, construing the provisions of the Edmunds law aimed against polygamous marriages, held that it was not necessary to the commission of the offense that the party charged should occupy the same room, or sleep in the same bed, or have sexual intercourse with the females charged to have been his polyga-

mous wives, but it was enough simply that he occupied the same house and ate for any considerable time at the same table.

We presume that the *gravamen* of the offense of concubinage is not simply living in the same house together, but having intercourse with each other as man and wife when there has been no legal marriage. Bouvier defines concubinage to be "the act or practice of cohabiting in sexual intercourse, without the authority of law or a legal marriage." Missouri has exactly the same statute as § 35, which was construed recently in the case of *The State v. Feasel,* 74 Mo. 524. The court says:

"To constitute concubinage within the meaning of section 1257, revised statutes 1879, [similar to § 35,] which makes it an offense to carry off any female under the age of eighteen years for the purpose of concubinage, it is not necessary that the illicit intercourse should continue for an indefinite or considerable length of time. A single act is sufficient."

This question was raised by the giving of an instruction by the trial judge, Hon. H. S. Kelly, whose work on "Criminal Pleadings and Practice" the defendant cites as authority in this action. The instruction was to the effect "that if the jury believe from the evidence that defendant did take away from her father Bella Murray, a female under the age of eighteen years, for the purpose of concubinage, that is, for the purpose of cohabiting with her as man and wife in sexual intercourse for any length of time, even for a single night, without the authority of a legal marriage, they would find him guilty. The point was raised by the defendant in that case that the word "concubinage" means something more than a single act of sexual intercourse, but the court held squarely that a single act was sufficient to constitute the crime.

We are aware that there are other definitions of the word "concubinage," but we are not inclined to explain and refine away the meaning of a wholesome and remedial statute when it fully covers the mischief intended to be reached. The main crime contemplated by this statute is the taking away

20 — 43 KAS.

of a girl from her parents for the purpose of defiling her. After one act of sexual commerce, the happiness and honor of the girl are destroyed, her character is gone, her reputation may be ruined. It is not all-important, as we view this case, to make a finely-drawn distinction, though radically different in its application and effects, between the occupation of that room alone one night with all the circumstances leading up to and following it, and a living together in a tenement as husband and wife unlawfully for any considerable time. Under the evidence in this case it is not necessary to go as far as the Missouri court did. The letters introduced and found at her parents' house, in which it is proposed to the girl to go to Brownwood, and wait for him; the giving of the presents; talking with her by means of the deaf-and-dumb alphabet; stealing out a hundred times during the year to meet him; his persistent attentions—all point to the fact that she was and had been for months his mistress; not kept by him in a room or house for that purpose, but seduced and cajoled from her father's house for the act of sexual intercourse, and then allowed to return.

The other objection of the defendant is to the introduction of the letters; especially those not found in her father's house. None of them have any date or signature, but the want of signature is not especially material in this matter, because they are identified as being in the handwriting of defendant. There is no positive proof that they were in the hands of Artie; however, her mother testified in an indefinite manner that she knew they were in her trunk; how or why she knew that fact is not stated. They were found at defendant's house. Conceding that there was no proof that they were ever in Artie's hands, yet they were admissible for the purpose of showing the defendant's motives in paying so much attention to this young girl; they are his admissions as much as though they had been found in his diary or had been told to a third person, and for that reason were admissible as evidence against him. Their lacking date is the most serious objection to them; yet the fact that this intimacy commenced in

the midsummer of 1888 and continued for nearly a year, is testimony sufficient to show that they must have been written either in 1888 or 1889, and were written during the iniquitous attentions, artifices, blandishments and protestations he was showering upon this young girl. They themselves were very strong evidence, for certainly no married man, the father of children, could have written to a young girl in the style they were worded for any other object or purpose than a criminal one. In the first letter introduced, which was found by Artie's trunk, there was a statement that they would go to Texas where his father lived, written to seduce and lead her away from home. The whole record teems with proofs of his paying her improper attentions, giving her presents, making signs and writing her letters, both before and after the occupation of the club-room together.

We think not only the single act of sexual intercourse of the night of the 17th and 18th of January, is fairly established, but that there had been criminal relations existing between them for a long period.

Under the evidence in this case and the authority of *The State v. Feasel*, supra, we recommend an affirmance of the judgment.

By the Court: It is so ordered.

All the Justices concurring.