THE STATE OF KANSAS v. CORNELIUS MORRISON *et al.*

1. RESISTING OFFICER — *Sufficient Information.* An information in a
criminal prosecution which charges the defendant, substantially in
the language of the statute, and in detail, with knowingly and will-
fully obstructing, resisting and opposing the sheriff in selling cer-
tain personal property on execution in a civil action, is sufficient,
although it may state other matters not necessary to be stated.

2. EVIDENCE *Sustains Verdict.* The evidence examined, and *held* to be
sufficient to sustain the verdict of the jury and the judgment of the
court.

3. INSTRUCTIONS — *Jury, not Misled.* The instructions of the court to
the jury examined, and *held,* that, although some portions of them
may not be technically correct, yet, taking them all together, they
could not have misled the jury in any material matter, and will not
require a reversal of the judgment.

4. FACTS *Showing Guilt.* Where a sheriff is about to sell personal prop-
erty on execution in a civil action, and the tendency of the conduct
of the owner and his friends at the time is to provoke a quarrel with
the sheriff, and to bring about a breach of the peace, and to prevent
the sale, and such conduct does in fact prevent the sale, such owner
and his friends who are guilty of such conduct must be held to be
responsible therefor, and for all that necessarily and reasonably fol-
lows from it, and for preventing the sale, whether they intended to
prevent the sale or not.

*Appeal from Jackson District Court.*

INFORMATION for resisting the sheriff in selling personal
property on execution. From a conviction at the November

term, 1890, the defendants, *Morrison* and *Cooney*, appeal. The facts appear in the opinion.

*Thos. H. Bain*, and *Vance & Campbell*, for appellants.

*John N. Ives*, attorney general, and *R. G. Robinson*, ex-county attorney, for The State.

The opinion of the court was delivered by

VALENTINE, J.: The defendants, Con. Morrison (whose full name is Cornelius Morrison) and Thomas Cooney, were convicted in the district court of Jackson county of the offense of having knowingly and willfully obstructed, resisted and opposed the sheriff of said county in the service of an execution and an order to sell personal property in a civil action. The defendant Morrison was sentenced to pay a fine of $200, and the defendant Cooney was sentenced to pay a fine of $150, and they were adjudged to pay the costs jointly, and each was to stand committed to the county jail until their respective fines and the costs should be paid; and both appeal to this court.

The first claim of error is, that the court below erred in overruling the defendants' motion to quash the information. The statute under which this information was drawn reads as follows:

"SEC. 165. If any person or persons shall knowingly and willfully obstruct, resist or oppose any sheriff, or any other ministerial officer, in the service or execution, or in the attempt to serve or execute any writ, warrant or process, or in the discharge of any other duty, in any case, civil or criminal, other than felony, or in the service or attempt to serve any order or rule of court, in any case, every person so offending shall, on conviction, be adjudged guilty of a misdemeanor, and punished by imprisonment in the county jail for a term not exceeding one year, or by fine not exceeding $500, or by both such fine and imprisonment." (Act relating to Crimes and Punishments, § 165.)

The information under which the defendants were prosecuted, after averring all the necessary preliminary matters,

and that the defendants with others, on September 1, 1890, unlawfully assembled together with the intent to disturb and to forcibly resist, oppose and prevent the sheriff from executing the aforesaid writs of execution and order of sale then in his hands, and copies of which are given in the information, and from proceeding with the sale, then charges as follows:

"And the said Con. Morrison, Thomas Cooney, . . . then and there being, did then and there unlawfully, knowingly and willfully obstruct, resist and oppose the said R. B. Francis, sheriff as aforesaid, in executing the said order of sale and writ of execution, and in his attempt to proceed with said sale of said personal property thereunder as aforesaid, by then and there knowingly and willfully using loud, profane, vulgar and threatening language towards him, the said sheriff, and language calculated to provoke an affray, and by conducting themselves in a threatening and boisterous manner, and by intimidating and assaulting said R. B. Francis, sheriff as aforesaid, in his attempt to perform his official duty as aforesaid, and by then and there disturbing the peace and quiet of said R. B. Francis, and preventing him from proceeding with said official sale, by reason of their (the said defendants') said unlawful acts and conduct, against the will of said R. B. Francis, and against the peace and dignity of the state of Kansas."

Section 108 of the criminal code, with reference to indictments and informations, reads as follows:

"SEC. 108. Words used in the statutes to define a public offense need not be strictly pursued, but other words conveying the same meaning may be used."

In the case of *The State v. McGaffin*, 36 Kas. 315, it is decided as follows:

"As a general rule it is sufficient if an indictment or information charges an offense in the language of the statute; and even the statutory words need not be strictly pursued, but others conveying the same meaning may be used."

See, also, the case of *The State v. White*, 14 Kas. 538. In the case last cited it is decided as follows:

"The common-law rules of construing criminal pleadings

have been set aside by our code of criminal procedure, and to that code must we look for the rules to determine the sufficiency of an information or indictment. It is not necessary in an information to use the exact words of the statute in charging an offense. It is sufficient if words are used conveying the same meaning."

See also the following cases: *The State v. Craddock*, 44 Kas. 489; *The State v. Foster*, 30 id. 365; *The State v. Hart*, 33 id. 218; *Madden v. The State*, 1 id. 340, 348, 349; *The State v. Barnett*, 3 id. 250. In the case of *The State v. Schweiter*, 27 id. 499, 506, it was decided as follows:

"Where the statute makes either of two or more distinct acts connected with the same general offense, and subject to the same measure and kind of punishment, indictable separately and as distinct crimes, when each shall have been committed by different persons and at different times, they may, when committed by the same person and at the same time, be coupled in one count as constituting all together one offense only. In such cases, the offender may be informed against as for one combined act in violation of the statute, and proof of either of the acts mentioned in the statute and set forth in the information will sustain a conviction."

Section 110 of the criminal code reads as follows:

"SEC. 110. No indictment or information may be quashed or set aside for any of the following defects: *First*, For a mistake in the name of the court or county in the title thereof. *Second*, For the want of an allegation of the time or place of any material fact, when the venue and time have once been stated in the indictment or information. *Third*, That dates and numbers are represented by figures. *Fourth*, For an omission of any of the following allegations, viz.: 'With force and arms,' 'contrary to the form of the statute,' or, 'against the peace and dignity of the state of Kansas.' *Fifth*, For an omission to allege that the grand jurors were impaneled, sworn, or charged. *Sixth*, For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged; nor, *seventh*, for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits."

In the case of *Madden v. The State*, 1 Kas. 340, 348, *et seq.*, the following language is used in the opinion of the court:

"The legislature evidently designed by the code of criminal procedure to simplify pleadings so that the technicalities, which had become so interwoven with the old system, should no longer be used to defeat the ends of justice. . . . The legislature has attempted to close these avenues of escape by the provisions of the code, whether wisely or not it is not for us to consider. It is for courts only to give effect to its provisions according to the rules prescribed by it. . . . The code has specified, in §§ 89 and 90, the requisites of an indictment, but has provided, in § 96, a large class of defects, for the existence of which the indictment may not be quashed or set aside. Now, it must be obvious to anyone reading the indictment in this case, that it does not state the facts constituting the offense in plain and concise language, without repetition, as directed in the second clause of § 89. But the sixth subdivision of § 96 declares that for any surplusage or repugnant allegation, where there is sufficient matter alleged to indicate the crime and person charged, the indictment shall not be quashed or set aside. The 89th and 90th sections are the guides for the pleader, from which he ought never to depart. The 96th section limits the court in the application of the requirements of those sections, and furnishes a different rule for its judgment than it had given the pleader for his guidance in §§ 89 and 90. By the 6th subdivision of the 96th section, if sufficient matter is alleged to indicate the crime and person charged, the indictment may not be quashed, although it may contain surplusage and repugnant allegations. Now, surplusage and repugnant allegations cannot be that 'plain and concise language, without repetition,' directed to be used in § 89. Yet the court must disregard such surplusage when called upon to pass upon the indictment, applying the criterion provided in §§ 89, 90 and 95, as explained and limited by § 96, and we think it will be found that the indictment, though inartificially and clumsily drawn, must be sustained."

Sections 89, 90, 95, and 96, above mentioned, correspond respectively to §§ 103, 104, 109 and 110 of our present criminal code. (See, also, *The State v. Furney*, 41 Kas. 115, 116.) Following the statutes and the cases above cited, it necessarily

follows that the court below did not err in over-
ruling the defendants' motion to quash the in-
formation.　No indictment or information shall
be quashed, "*Sixth,* For any surplusage or repugnant allega-
tion, when there is sufficient matter alleged to indicate the
crime and person charged; nor, *seventh,* for any other defect
or imperfection which does not tend to the prejudice of the
substantial rights of the defendant upon the merits." (Crim-
inal Code, § 110.)

*1. Resisting officer—sufficient information.*

The next alleged errors have reference to instructions given
by the court to the jury; but before proceeding to the consid-
ation of these instructions, it will be proper to state some of
the evidence in the case.　Evidence was introduced tending
to show, among others, the following facts: In 1890, Reuben
B. Francis was the sheriff of Jackson county.　On August
18, of that year, he held in his hands an execution and an
order of sale against personal property of the defendant Con.
Morrison, and about that time he levied upon such property,
and advertised the same to be sold on September 1, 1890, at
2 o'clock in the afternoon.　On Tuesday, August 26, 1890,
he was at Morrison's house, but Morrison was not at home;
Mrs. Morrison and some of the children were there.　The
sheriff believed that some of the oats that he had previously
levied on had been removed, and that Morrison was responsi-
ble for their removal.　He told Mrs. Morrison that he knew
where the oats had gone, and that if Morrison did not give
him the money for them he would have him arrested and put
in jail.　The above is according to the sheriff's testimony.
James Morrison, a son of the defendant, testified that this
was on Thursday, August 28, 1890, and that the sheriff,
among other things, told his mother, using some profane lan-
guage, that he would have a warrant for his father, and put
him in the penitentiary.　This the sheriff denies.　Mrs. Mor-
rison at the time was in an advanced stage of pregnancy, and
on the Sunday following gave birth to a child.　On Monday
morning, Judge McAloon, the principal adviser of Morrison,
and Morrison and others, procured a warrant from a justice

of the peace for the arrest of the sheriff, upon grounds in some manner connected with the aforesaid conversation had between the sheriff and Mrs. Morrison, and placed the warrant in the hands of a constable named Frank Jackson to serve. On that day, and before the time for the sale to occur, a large number of persons gathered at Morrison's house. Jackson, the constable, testified that McAloon said to him, "Don't serve the warrant unless he [the sheriff] commences to sell." This was said in the presence of Morrison, and McAloon, as a witness, admitted on his cross-examination that he had heard Morrison tell the constable "not to arrest him [the sheriff] unless he commenced the sale." Jackson arrested the sheriff before the time for the sale to commence. But it would seem that the arrest did not interfere materially with the sheriff's liberty, or his freedom to proceed with the sale. The sheriff testified on the trial that the following then occurred:

"McAloon came to me, and in the presence of all these defendants he said I could not go on with the sale, for the reason that I was under arrest. . . . Mr. Cooney was standing behind me, and he says, 'To come down to a man's place and do as you have done here, damn you, you will get a rope around your neck before you get away from here.' . . . 'You need not laugh, God damn you; I mean it!' . . . Mr. Morrison about that time says: 'I would like to see any son of a bitch move a hoof of this stuff away,' or something of that nature. At that time McAloon took me off over toward the stable, and Morrison followed; came over there and cursed me; called me sons of bitches, and all kinds of names. He came right up in front of me and said: 'God damn you! I would like to wipe the ground with you.' He wanted to whip me, whether or no. . . . He [Morrison] drove Mr. Fellows away from there. . . . He told him, God damn him, he had no use for him there, and to get out from there. . . . He went, and went quick. . . . I seen a revolver in Mr. Morrison's pants, right in there [pointing to his own pants]; think it was on that side; it was what I took to be a revolver; could see the handle sticking a little above top of his pants. . . . The tone of voice was pretty wicked; think they meant what they said."

On cross-examination, the sheriff, Francis, testified: "He [Morrison] said he would like to see a son of a bitch move any of that stuff from there. . . . About that time there was one Mr. Cooney began to talk about hanging me, and I got my mind off the other business." McAloon, who resides at St. Marys, brought a law book with him. The sheriff also testified that Morrison shook his fists at him while he was talking to him, and also testified that he announced that he postponed the sale for one week, and he did this because he thought there would be trouble and somebody would get hurt if he went on with the sale. The sale did not take place on that day, nor for about two weeks afterward. The constable, Jackson, testified, among other things, that Morrison —

"Became enraged and said: 'Mr. Francis, I want you to understand one thing right here, you won't sell a damn thing that is on this place.' . . . 'No God damn son of a bitch could come from Holton and take anything off that place.' . . . Mr. Morrison says [to Fellows]: 'What are you doing here? I did not tell you to come here, damn you; get out of here; and he got. . . . I heard him [Morrison] say that the sheriff could not sell anything — could not sell anything that was on that place.' Mr. Swetlick testified that Morrison says: 'You don't come and sell this property; you or no damn son of a bitch from Holton should sell it.' . . . They were shaking their fists right at the sheriff."

Mr. Faulk testified that, after the time at which the sale was to take place, Morrison "said that the sheriff came down there to sell some property that belonged to him, and that he stopped the sale and would not let him sell it." Mr. Fellows testified that, on the day that the sale was to take place, he went there to bid on some of the things to be offered, and "there was something that I took for a revolver in the pocket of Morrison. I did not care about opposing that thing." He also testified to Morrison's threatening demonstrations. Fellows left the place. He testified, "I thought there would be trouble if I stayed." Mr. Franze testified that Morrison said that "no Holton son of a bitch, or sons of bitches — don't know whether he used the singular or plural number,

—could take any property from there." He also testified
that both Morrison and Cooney seemed "excited and violent,"
and that Morrison seemed "very much enraged." Indeed, all
the witnesses testified that Morrison and Cooney were both
angry, and seemed to mean what they said.   Judge McAloon,
Morrison's principal adviser, testified that he "thought that
it would not be safe to proceed with the sale;" and he also
testified that "Mr. Cooney came up to the sheriff in an angry
and violent and threatening manner; shook his fists at him,
and told him that no son of a bitch from Holton could take
away any property off that farm." Mr. Cleveland testified
that, before the day on which the property was to be sold,
Morrison said that "it would not be sold; no one would take
anything off the place; he would not permit it." There was
much other testimony of the same character as the above.

On the side of the defendants, the witnesses testified that
all the trouble that occurred on the day on which the sale was
to take place occurred because of what was said by the sher-
iff to Mrs. Morrison, on the Tuesday or Thursday prior to
the day on which the sale was to take place, and that nothing
was said or done for the purpose of preventing the sale, or
hindering the sheriff from making it. The evidence on many
points was very conflicting, but the jury and the court evi-
dently did not fully believe the testimony of the defendants'
2. Evidence sus- witnesses, and did believe the testimony of the
tains verdict.   witnesses for the state. It is probably true that
what was said by the sheriff to Mrs. Morrison, prior to the
day on which the sale was to take place, partially furnished
the excuse for some of the threatening demonstrations that
were made by the defendants and their friends; but evidently,
from the evidence, the principal object on the part of the de-
fendants and their friends was to prevent the sale, and they
accomplished their object so far as that day was concerned.

The court below instructed the jury, among other things,
that they could not find the defendants guilty unless they
found beyond a reasonable doubt that the defendants did, as
charged in the information, knowingly and willfully obstruct,

resist and oppose the sheriff with respect to his intended sale; and also instructed the jury as follows:

"You are the exclusive judges of the testimony, and of the credibility of the witnesses. If any one or more of them has willfully testified falsely to any material fact in the case, you are at liberty, but not bound, to disregard the whole of the testimony of that witness. If in considering the testimony you are unable to reconcile it, which would be your first duty, then it is for you to determine which side, when it is directly in conflict, you will believe. You are not at liberty to arbitrarily disregard the testimony of any witness. You should consider it and give it the weight it is entitled to, considering all the surrounding circumstances that throw any light upon it; and it is your duty to consider the interest of the person testifying, if any is shown on the stand; his intelligence, his means of knowledge, his bias in any direction, from friendship or otherwise, in determining the weight of testimony of any witness on any side; and from all such considerations and any other that in your judgment would throw any light on the value of the testimony of the witness, and from it all, determine its weight. I need not call your attention to the fact that there is conflicting testimony with regard to material matters in the case. If you are convinced that any one of them testified falsely, as some of them must have done, if their testimony conflicts, it is for you to determine which you will believe and give it the weight it is entitled to."

The last sentence of the above instruction is objected to, but considering it in the light of the testimony and of the other instructions, it cannot be considered as erroneous or materially erroneous. The defendants also objected to other instructions. The court instructed the jury that the question for them to determine was "whether or not the defendants, or any of them, willfully and knowingly obstructed, resisted or opposed the sheriff in the execution of a lawful duty;" and then defined these various words. In defining the word "willfully," the court used the following among other language:

"Willfully, in this connection, means that, if they knew the effect of what they were about to do would be to obstruct the officer in the performance of his duty, or such effect might

be reasonably apprehended from their acts, then they may be found to have willfully so acted."

The judge also in this connection instructed the jury as follows:

"And so I say to you, that it is not absolutely necessary to a conviction under this section of the statute that they should, in what they did, have actually intended that no sale should take place, if what they did do would, reasonably considered, prevent a sale.    In reference to the claim on the part of the defense, that whatever was done there was in regard to some grievance Mr. Morrison had against the sheriff for misconduct toward his wife at the time when he was not present— I say, if the purpose of these people, Mr. Morrison or his friends, these defendants, was to get up an altercation there with the sheriff, the reasonable consequence of which would be — not that they intended to do so — but the reasonable consequences of which would be that the sale could not take place, then they would be within the statute, although they did not intend, actually intend, to disturb the sale at all.    The statute says, if they shall obstruct an officer in the execution of his duty; that would mean, if they put impediments in his way, as getting the property away so that he could not get it for sale, would be obstructing an officer in the execution of his duty.    Opposing: That might be done in various ways; by ordering away bidders; giving notice to the bidders that the title was not good ; that the sheriff had no right to sell, and various things of that sort, would be within the meaning of this clause, opposing the sale or resisting an officer in the execution of a writ.    In this case, if the sheriff was there to sell the property, and they had prevented him by force from collecting the property together at a place where it could be sold, that would be resisting the execution of this process."

Some portions of these instructions may not be technically correct, and yet, taking the whole of the instructions together, we do not think that they were misleading or

3. Instructions— jury, not misled.

erroneous as to anything material in the case, and certainly not so misleading or erroneous as to require a reversal of the judgment.    If, for instance, some person had been at the place of the intended sale, who in good faith believed that he owned the property, and not Morrison, and that the sheriff for that reason had no right to sell it, he

would have had a right to give notice of his claims to the sheriff, and to the bidders, and to all other persons, and to have warned all persons not to bid on the property for the reason that he claimed to own the same.   But there is nothing of that kind in this case, so far as the present defendants are concerned.   They knew what they were doing, and certainly must have known that the tendency of their acts would be to prevent the sale.   In this connection it is necessary to make some further comment upon the instructions.   While the defendants must have known that the tendency of their acts and conduct would be to prevent the sale, and while in all probability they actually intended that such acts and conduct should bring about such result, yet the court below instructed the jury that it was not absolutely necessary to a conviction that the defendants should have actually intended that no sale should take place, provided if what they did would, when reasonably considered, prevent the sale.   We are inclined to think that the instruction, under the circumstances of this case, was right.   The tendency of the acts and conduct of the defendants was to provoke a quarrel with the sheriff, and to bring about a breach of the peace. Their conduct was wrong, and they should be held to be responsible for all that would necessarily and reasonably follow from it, and which did in fact follow from it.   The sale was prevented because of the defendants' conduct, and they evidently had reason to believe, and did believe, that such would be the result.

4. Facts showing guilt.

We cannot say that material error was committed by the court below, and therefore its judgment will be affirmed.

All the Justices concurring.