72   481
75   440

THE STATE OF KANSAS V. HERBERT TUCKER.

No. 14,486.   (84 Pac. 126.)

SYLLABUS BY THE COURT.

1. ABDUCTION—*Female under Eighteen—Principal Element of the Crime.*  The principal element in the crime of taking away any female under the age of eighteen years, without the consent of her parent or guardian, as defined in section 2020· of the General Statutes of 1901, is the purpose for which such female is taken; and subsequent cohabitation and sexual intercourse are not essential to the commission of such crime, but are merely evidence thereof.

2. ——— *Concubinage—Duration Immaterial.*  Concubinage, as used in the section of the statute above mentioned, means to live together and have sexual relations as husband and wife. The time during which such relations are intended to, or actually do, continue is immaterial.

3. PRACTICE, DISTRICT COURT — *Continuance — Statutory Requirements.*  It is not error to deny an application for a continuance, where the application therefor does not contain all the statutory requirements.

31—72 KAN.

4. ———— *Instructions.* It is not error for a trial court to refuse to give an instruction requested by the defendant, when it gives one containing substantially the same idea contained in the one refused.

Appeal from Edwards district court; CHARLES E. LOBDELL, judge. Opinion filed December 9, 1905. Affirmed.

*C. C. Coleman,* attorney-general, *J. S. West,* assistant attorney-general, and *A. C. Dyer,* county attorney, for The State.

*John W. Adams,* and *W. N. Beezley,* for appellant.

The opinion of the court was delivered by

GRAVES, J.: On April 5, 1905, the defendant was convicted and sentenced by the district court of Edwards county to confinement in the penitentiary for not exceeding five years for taking Minnie Bishop, a female under the age of eighteen years, away from the county without the consent of her parent or guardian, for the purpose of concubinage, in violation of section 2020 of the General Statutes of 1901, which reads:

"Every person who shall take away any female, under the age of eighteen years, from her father, mother, guardian, or other person having legal charge of her person, without their consent, either for the purpose of prostitution or concubinage, shall upon conviction thereof be punished by confinement and hard labor for a term not exceeding five years."

The information contained two counts. The first charged the taking away to have been for the purpose of concubinage, and the other for the purpose of prostitution. The information reads:

"*First count:* I, A. C. Dyer, the undersigned county attorney of said county, in the name, by the authority and on behalf of the state of Kansas, come now here and give the court to understand and be informed that on the 17th day of December, 1904, in said county of Edwards, in the state of Kansas, one Herbert Tucker did then and there feloniously one Minnie Bishop, a

female under the age of eighteen years, to wit, of the age of thirteen years, take away from one J. J. Bishop, her father, and one Floy Lippoldt, they, the said J. J. Bishop and Floy Lippoldt, then and there having the legal charge of the person of the said Minnie Bishop, without the consent and against the will of the said J. J. Bishop and Floy Lippoldt, for the purpose of concubinage.

"*Second count:* I, A. C. Dyer, county attorney as aforesaid, in the name, by the authority and on behalf of the state of Kansas, as aforesaid, come now here and give the court to further understand and be informed that on the 17th day of December, 1904, in said county of Edwards and state of Kansas, said Herbert Tucker did then and there feloniously one Minnie Bishop, a female under the age of eighteen years, to wit, of the age of thirteen years, take away from one J. J. Bishop, her father, and one Floy Lippoldt, they, the said J. J. Bishop and Floy Lippoldt, then and there having the legal charge of the person of the said Minnie Bishop, without the consent and against the will of the said J. J. Bishop and Floy Lippoldt, for the purpose of prostitution."

The defendant moved to quash the information for the reason that it did not state facts sufficient to constitute the crime sought to be charged, and that it was fatally indefinite and uncertain. The motion was denied, and this ruling is claimed to be erroneous.

The crime is stated substantially in the language of the statute, which, as a general rule, is conceded to be sufficient. Appellant insists, however, that this particular crime is an exception to this rule. We think that under the decisions of this court this information was sufficient as against the motion. (*The State v. White,* 14 Kan. 538; *The State v. Foster,* 30 Kan. 365, 2 Pac. 628; *The State v. Beverlin,* 30 Kan. 611, 612, 2 Pac. 630; *The State v. Morrison,* 46 Kan. 679, 27 Pac. 133; *The State v. McGaffin,* 36 Kan. 315, 13 Pac. 560; *The State v. Jones,* 16 Kan. 608; *The State v. Bryan,* 34 Kan. 63, 8 Pac. 260; *The State v. Overstreet,* 43 Kan. 299, 23 Pac. 572.)

After the denial of his motion to quash the informa-

tion the defendant moved to require the state to elect upon which count it would rely. This motion was allowed, the state elected to stand upon the first count, and upon this count the defendant was convicted. The most important complaint made by the defendant is that the court misdirected the jury in an instruction which reads:

. "You are further instructed that 'for the purpose of concubinage,' as used in the information and in these instructions, means for the purpose of living and cohabiting with her as his wife; but it is not necessary that permanent, or even long-continued, cohabitation shall have been contemplated."

The definition given to the word "concubinage" in this instruction is objected to by the appellant, and the objection has been urged with great force and ability. The appellant insists that the idea of husband and wife, which is necessarily involved in the word "concubinage," does not sufficiently appear in the facts shown; and that the conduct of the parties indicates with equal, if not greater, force that the intent of the defendant was mere temporary sexual gratification, rather than the cohabitation as husband and wife, which is essential to the crime charged. It is urged that this instruction left the jury free to infer from cohabitation, however brief in duration, even if limited to one act of sexual intercourse, that such act was done as husband and wife. Two other instructions were given that modify to some extent the one above quoted. They read:

"It is not necessary to proof of the purpose charged that an act of sexual intercourse shall have been actually proved. If all the facts and circumstances proved at the trial are such that they cannot in the nature of things be true and the defendant be innocent of the guilty intent—that is, the intent to live and cohabit with Minnie Bishop in carnal knowledge as his wife—then you would be justified in finding him guilty of that purpose."

"You are further instructed that the important element of the offense is the taking away of the female

from her father and Mrs. Lippoldt, without their consent, for the illicit purpose, and that this may have been accomplished by the persuasion, enticement, advice or other active influence of the defendant. And that if she was thereby removed beyond the control of her father, J. J. Bishop, and Floy Lippoldt for such purpose the offense is complete, and this without regard to whether or not she consented to go."

To consider properly the proposition contended for it will be necessary to refer briefly to the facts presented at the trial. Prior to September, 1904, Minnie Bishop resided with her father on a farm. Her mother died twelve years before. She was thirteen years of age—a mere child, wearing short skirts. The defendant was a married man about thirty-three years of age, and was engaged in the implement business as an employee for a firm in Kinsley. The father of Minnie arranged with the defendant and his wife for her to stay at their house and attend school in Kinsley until he could find her another place. About three weeks afterward he placed her in charge of Mrs. Lippoldt, who resided a few blocks from the defendant. About this time the defendant met John Hawk and T. W. Hinman, who were old acquaintances and friends of defendant's wife. They were frequent visitors at the home of the defendant, and Minnie Bishop, upon the invitation of Mrs. Tucker, was also often there and became well acquainted with them. During the early winter they all talked of going "out west." Minnie was very much infatuated with the promises made to her by the defendant. He told her it was a splendid country, much better than this; she could go along, and they would have good times. In preparing for the trip the defendant's wife made some new waists and a long skirt for Minnie. The defendant instructed her to say nothing about the trip to any one, and advised her how to get her clothes away from Mrs. Lippoldt's without exciting suspicion.

December 17, the time set for leaving, Minnie took her scant wardrobe to the defendant's house. At the

last moment it was decided that only the defendant and Minnie should go. She was completely under the influence of the defendant, and was elated over the prospect of the journey. The defendant packed his trunk, putting Minnie's clothing in with his own. At train time, late at night, the whole party went to the depot. Hinman gave Minnie a ticket to Pueblo, and ten dollars in cash, saying that the defendant gave him the money to buy the ticket, and that that amount was left. He put her in the chair-car. The defendant got on the smoker. Soon after the train started defendant found Minnie and remained with her. Minnie gave him the money received from Hinman. She had no money of her own. She understood that she was going to live with the defendant, but did not understand at the time she left that it was to be as husband and wife. While on the train the defendant told Minnie that it would be necessary for her to represent herself as his wife; that he would assume the name of Van Anten, and she must go under the same name.

They reached Albuquerque about ten o'clock at night, went to a hotel and occupied the same room, undressed and went to bed together. They remained there and occupied the same room and bed four nights. The defendant while there went under the name of Van Anten. The father of Minnie followed, rescued his daughter, and caused the defendant to be arrested and brought back for trial.

Concubinage, as used in the section quoted, had no settled common-law meaning. (*The People v. Bristol*, 23 Mich. 118, 127; *The People v. Cummons*, 56 Mich. 544, 23 N. W. 215.) It must be understood in its ordinary, or popular, sense. (Gen. Stat. 1901, § 7342.) According to Webster's International Dictionary it is "the cohabiting of a man and a woman who are not legally married; the state of being a concubine." And a concubine is defined to be "a woman who cohabits with a man without being his wife." Bouvier's Law Dictionary defines concubinage as "the

act or practice of cohabiting, in sexual commerce, without the authority of law or a legal marriage." Otherwise stated, it is living together as married people do without being legally married. Anciently, concubinage was a state of marriage not sanctioned by law.

Concubinage is not the crime of which the defendant was convicted. He was accused of taking Minnie Bishop away, without the consent of her parent or guardian, for the purpose of concubinage. The gist of this offense consists in the intent or purpose of the taking away. What the defendant actually did was more important as evidence of his purpose than as showing that a state of concubinage had already been established. Sexual intercourse is not essential to the commission of this offense—it is only evidence of the character of the cohabitation. (*State v. Bobbst,* 131 Mo. 328, 338, 32 S. W. 1149; *Henderson et al. v. The People,* 124 Ill. 607, 17 N. E. 68, 7 Am. St. Rep. 391.)

In case of actual marriage, if the man fall dead as he leads his bride away from the altar no question could arise as to his intent in contracting the marriage. So in this case the defendant might have been captured and Minnie rescued at Albuquerque, after she was undressed and before she was despoiled, and the circumstances then existing might have been sufficient to show that the purpose of defendant was to use her as his concubine. If so, such circumstances alone would have been sufficient to establish the crime.

This idea is clearly stated in these instructions. The jury were plainly told that before they could convict the defendant they must find that he took Minnie Bishop away with the intent, and for the purpose, of living and cohabiting with her as his wife. That was correct. It was also correct to tell them that such cohabitation need not have continued for any great time. (*The State v. Overstreet,* 43 Kan. 299, 23 Pac. 572; *The State v. Bussey,* 58 Kan. 679, 50 Pac. 891; *Henderson et al. v. The People,* 124 Ill. 607, 17 N. E. 68, 7 Am. St. Rep. 391.)

If the defendant intended, when he took Minnie Bishop away from her home and beyond the protection of her parents and relatives, to make use of her as a concubine, then whether their subsequent cohabitation was long or short, whether sexual intercourse occurred often, once only, or not at all, is unimportant. The defendant cannot be excused from the consequences of his crime because he was interrupted in its enjoyment before his brutal appetite was fully satisfied.

The jury by their verdict found substantially that the defendant left Edwards county with Minnie Bishop, intending to live and cohabit with her as if she were his wife so long as it might be convenient and desirable. The evidence fully justified this conclusion. The victim of the defendant's lust was a mere child, too young and inexperienced to understand and appreciate the import of the circumstances that led up to and accomplished her ruin. She had never felt the restraining influence of a mother's watchful care, nor received the protecting admonition and loving counsel which only mothers can impart to their daughters. In the company of experienced and designing people she was without protection and helpless. She was among strangers who appeared to her to be kind and generous. They offered her a home, clothes, and "a good time." They proposed to take her to a better country, where she could travel about and live at ease. She believed in them. These promises presented to her young mind all that was desirable in life.

The defendant, after infatuating her with the idea of going away, instructed her how to deceive her friends and get away without exciting suspicion. He put her clothes in his trunk. He boarded the train as if a stranger to her, but immediately sought her company and remained with her. He told her he had taken another name, which she must assume, and that they must pass as husband and wife. When they

stopped he took her to a hotel, and secured lodging as he would have done if she had been his lawful wife. He concealed their identity under an assumed name. He placed her in a room and kept her there for his own exclusive use. She was not there for hire, nor for the use of men indiscriminately, and, therefore, prostitution was not the purpose for which she was taken from home. (*The State v. Goodwin,* 33 Kan. 538, 6 Pac. 899.) The jury reached the only reasonable conclusion as to the defendant's purpose in this respect.

There was no direct evidence that sexual intercourse ever took place between the defendant and Minnie Bishop. It is suggested that they may have occupied the room and bed at the hotel together for economical reasons. It is also urged that the jury might have found differently if they had been properly instructed upon the force and effect of circumstantial evidence. The defendant requested the court to give the jury the following instruction:

"The jury are instructed that the evidence of the intention of the defendant as to the taking of Minnie Bishop from Edwards county, Kansas, for the purpose of concubinage, the charge made against him in the information in this case, is circumstantial; and in this connection you are instructed that before you can convict the defendant upon circumstantial evidence the circumstances must all be consistent with each other, tending to prove guilt of the defendant, and must be inconsistent with the defendant's innocence from any rational conclusion."

This was refused, and the court gave one that reads:

"It is not necessary to proof of the purpose charged that an act of sexual intercourse shall have been actually proved. If all the facts and circumstances proved at the trial are such that they cannot in the nature of things be true and the defendant be innocent of the guilty intent—that is, the intent to live and cohabit with Minnie Bishop in carnal knowledge as his wife—then you would be justified in finding him guilty of that purpose."

In form and phrase improvement might be made in either of these instructions, but in substance they both probably state the law correctly. The one requested by the defendant states substantially that the jury may infer from the evidence that defendant took Minnie Bishop from Edwards county for the purpose charged, if the facts proved are all consistent with such inference, consistent with each other, and inconsistent with any other rational conclusion. The instruction given tells the jury that such inference may be drawn if in the nature of things the facts established on the trial cannot otherwise be true. The instruction given is probably more favorable to the defendant than the one refused. This instruction of the court contains an additional element, to the effect that actual proof of sexual intercourse was unnecessary if the facts proved clearly indicated that the defendant had Minnie Bishop there for that purpose. The legal rule for the solution of questions of this kind has been the same for centuries, and is likely to continue unchanged until a decided improvement occurs in human nature.

An eminent writer upon the law of evidence used language many years ago which seems peculiarly pertinent to this case. He said that "it is physically possible for a man and woman in good health, not married to each other, to remain over night locked in a room together, and occupy the same bed, naked, and not have sexual intercourse; but the law does not proceed upon such a supposition." It is safe to assume that human nature at the present time is very much the same as when that statement was written. The jury were evidently of the opinion that the same results followed from the situation at the hotel in Albuquerque that usually transpire under the same circumstances elsewhere. We cannot say that such conclusion is erroneous.

When this case was called for trial the defendant made application for a continuance on account of ab-

The State v. Tucker.

sent witnesses. He filed an affidavit showing that he had been in jail continuously since his arrest, in January, 1905; that Hawk and Hinman, the men who made the acquaintance of Minnie Bishop at his house, and helped her on the train when she left, and who were old-time friends and schoolmates of the defendant's wife, were material witnesses, but then absent and beyond the reach of a subpœna; that these witnesses had been subpœnaed by the state February 28, and had been present in the city until within a few days before this application was made, when they disappeared; that the wife of the defendant was a party to the disappearance of Minnie Bishop, and her trial was then pending; that she caused a subpœna to be issued for said witnesses in her own case, but it was returned "not found." The defendant was unable to say why these witnesses left, or where they went, and nothing was shown to indicate that they would ever be found. No diligence whatever was shown.

The granting of a continuance rests largely in the discretion of the trial court, and the refusal to grant an application therefor cannot be declared erroneous unless the statutory requirements have been fully complied with. This showing was insufficient.

The record contains thirty assignments of error. They relate principally to instructions given and refused. Those not specifically mentioned have all been carefully examined and considered, and we have been unable to find any material error. The judgment is affirmed.

All the Justices concurring.