No. 22,647.

THE STATE OF KANSAS, *Appellee,* v. FRED C. WILLIAM, *Appellant.*

### SYLLABUS BY THE COURT.

CRIMINAL LAW—*Taking Minor Female for Purpose of Prostitution—Evidence.* The evidence examined, and held to be altogether insufficient to sustain a conviction on a criminal charge of feloniously taking a minor female child away from her parents for the purpose of prostitution.

Appeal from Osborne district court; RICHARD M. PICKLER, judge. Opinion filed May 8, 1920. Reversed.

*A. W. Relihan, T. D. Relihan,* both of Smith Center, *N. C. Else,* of Osborne, and *Clark A. Smith,* of Cawker City, for the appellant.

The State v. William.

. *Richard J. Hopkins,* attorney-general, *J. K. Mitchell,* county attorney, *I. M. Mahin, F. W. Mahin,* both of Smith Center, *W. E. Mahin,* and *H. McCaslin,* both of Osborne, for the appellee.

The opinion of the court was delivered by

DAWSON, J.:   Fred C. William was convicted under section 35 of the Crimes Act (Gen. Stat. 1915, § 3396) for taking away from her parents Mattie Buck, a female person under the age of eighteen years, without her parents' consent, for the purpose of prostitution.   .

William appeals, and his principal contention is that there was no evidence to sustain the conviction.

The information against William was in two counts:  the first was for taking the girl away for the purpose of prostitution, and the second was for taking her away for the purpose of concubinage.   There was some evidence against William which might have justified a verdict and judgment on the second count, but the jury acquitted him on the latter charge.

Touching the charge upon which William was convicted, the evidence disclosed that William was a married man of about 44 years of age, and that he had a wife, and two sons, eighteen years and eleven years old respectively; that he lived on a farm; and that the girl, who was about sixteen years old, resided with her parents and an older sister on another farm a mile or two away.   The girl was infatuated with William, and wrote him several love letters which were delivered to defendant by his younger son.   One or more of these were answered by William.   He appears to have been away from home at the time, and his letter indicates that he lustfully desired to possess the girl:

"i hate to leave you do you beleave me pettie dear well A H i am going to try to get you by 9 or 10 if we can get things through all right: S H i eather have got to have you or i got to come home and stay S H for this is gitting afful lonesome and tired of doing this way S H."

The girl testified that she had talked with William about going away with him:

"He said if I would go with him he would get me a lot of nice clothes and things and I wouldn't have to work so hard.   About a week before he wanted me to go I said I was afraid the folks would catch me and he said there wasn't any danger.   He didn't then say where he was going to take me.   Had conversation about his feeling toward me—well, once a week,

just a week before. He said he loved me and thought lots of me and wanted to marry me and thought of me when he went to bed. He said he couldn't live without me. She had it wrong in there—he never said anything about me marrying him. He said he wanted to be near me. I talked with him several times prior to the 2d day of March. Fred William was affectionate with me—he hugged and kissed me."

On the night of March 2, 1917, the girl left home in her school dress and without traveling clothing, and joined William. He provided her with a cloak and cap. He also provided her with a hand bag filled with the usual articles suitable for a girl on a sojourn from home. They drove in William's automobile to Smith Center. The night train being late, and she fearing capture, they drove to Phillipsburg, where she purchased a ticket to Limon Junction, Colo., and he purchased a ticket to Goodland. She testified:

"On the way he said I would buy my ticket to Limon and he would get his to Goodland and he gave me money to buy it with. Just before we got to Phillipsburg he said he would buy his ticket from there on to Limon Junction from Goodland, so people wouldn't think we were going together. At Phillipsburg I waited for the train in ticket agent's office; bought ticket to Limon; went to the window and called for a ticket to Logan first; I told him I would buy my ticket to Goodland then. Mr. William said to the ticket agent that he heard me say over at the hotel that I was going to buy my ticket to Limon Junction. Had not been to the hotel prior to that time. He said after we got to Limon we would go to the hotel. Bought ticket, waited for the train and went to Norton. William went with me. He didn't help me on the train at Phillipsburg that I remember of. He took the two grips and we were seated across the aisle from one another in the day coach. Were on the train at Norton. At Norton the sheriff arrested Mr. William."

To sustain the conviction on the first count, the state submits the following summary of the evidence:

"1. The Buck and William families were apparently very friendly until the abduction.

"2. William's undue attention to the older girl caused her expulsion from school.

"3. That about three years before the abduction, defendant and wife persuaded and coerced the older girl to write letters falsely charging her father with incest.

"4. That these letters were kept secret until the trial of this case defendant claiming he wanted them for his future defense.

"5. No attempt was ever made to stop the alleged incest.

"6. . . . Love letters passed between defendant and Mattie Buck just prior to the abduction.

"7. That defendant laid an almost perfect foundation for an alibi.

"8. While he was supposed to be away from home, he was seen in the neighborhood by the two Buck girls.

"9. On the very night of his return home arrangements for Mattie's departure were completed.

"10. That Mrs. William's participation in these arrangements were unknown to Mattie.

"11. That defendant accompanied Mattie Buck until the arrest was made.

"12. That Mattie Buck was sixteen years of age and was taken from the custody of her father and mother is not disputed."

This court is constrained to hold that the foregoing evidence (all questions of its competency aside) does not prove the charge that the defendant took this girl away from her parents for the purpose of prostitution. The trial court instructed the jury—

" 'Prostitution' as alleged in the information, means the practice of a female offering her body to use in indiscriminate intercourse with men, as distinguished from sexual intercourse confined to one man—the act of permitting a common and indiscriminate sexual intercourse for hire."

Perhaps it was not necessary for the instruction to include the words "for hire." In *The State v. Goodwin*, 33 Kan. 538, 541, 6 Pac. 899, it was said:

"If the appellant took away the female for the purpose of prostitution, under the circumstances alleged in the information, he would be guilty of one offense; but if he took her away for the purpose of concubinage, but not for prostitution, he would be guilty of another offense. If the appellant took the female away for the purpose of prostitution, he did so for the purpose of devoting her to infamous purposes, that is, of offering her body to indiscriminate intercourse with men. If he took her away for concubinage only, then his purpose was to cohabit with her in sexual commerce, without the authority of law or a legal marriage."

Since the jury acquitted the defendant upon the only charge which the evidence tended to establish, and the evidence entirely fails to prove the charge upon which defendant was convicted, the judgment cannot stand. The judgment of the district court will be reversed and the cause remanded for a new trial.

Mr. Justice Burch and Mr. Justice West, and the writer, are of opinion that the court ought to order the discharge of the defendant; but a majority of the court hold that the matter should be left to the discretion of the county attorney with a

suggestion to that officer that unless new and substantially additional evidence to support the charge is discovered and available, it will be useless to put the county to the expense of another trial.

Reversed.