No. 27,718.

THE STATE OF KANSAS, *Appellee*, v. ADOLPH DUSIN, *Appellant*.

(264 Pac. 1043.)

SYLLABUS BY THE COURT.

ABDUCTION—*Taking for Purpose of Concubinage—Sufficiency of Evidence.* In a prosecution for the taking away of a female under the age of eighteen years from her father or other person having legal charge of her person, without their consent, for the purpose of concubinage, the evidence considered and held sufficient to support a conviction.

Appeal from Phillips district court; EDWARD E. KITE, judge. Opinion filed March 10, 1928. Affirmed.

*Dan Hopson,* of Phillipsburg, and *W. E. Mahin,* of Norton, for the appellant.

*William A. Smith,* attorney-general, and *William Kingery,* county attorney, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The defendant appeals from a conviction of having taken away Erma Morton, under the age of thirteen years, from her father and school teacher for the purpose of concubinage.

There was evidence showing that the defendant, eighteen years old, and Erma Morton, twelve years old, had met at dances and entertainments, but had not gone together. On February 19, 1926, by prearrangement with her, he picked her up near a country school west of Phillipsburg where she was a pupil. The morning of that same day he had repainted his Ford roadster, giving it a different color, and previous to that time had written what might be termed a decoy letter indicating that they were going to Fairbury, Neb. However, they went in another direction. They went west and south from the schoolhouse, avoiding main traveled roads to prevent detection.

The witness Erma Mortion testified:

---

Abduction, 1 C. J. p. 295 n. 58; 1 R. C. L. 66.

State v. Dusin.

"We went about two miles west and turned south to Speed. The roads were drifted with snow. . . . We went south through Speed until there wasn't any road going south, and then turned west a half mile, and then south again past the Sugar Loaf mound. I don't know where we went from there, but I believe continued south. The roads were bad and we were stuck for an hour and a half or two hours, and some one helped us out. It was dark when we got out. We stayed all night at Mr. Stice's, arriving about ten o'clock in the evening. We did not stop for supper or lunch. Mr. Dusin had conversation with Mr. Stice, saying we had been married for three months and lived at Norton and we were going to Great Bend. Mr. Stice said we could stay all night. They talked quite a while, and we finally went to Mr. Stice's house. He was alone. We slept in the southeast room—no one else was there but Mr. Dusin and myself. We both undressed. I wore my underwear and underskirt. He had his shirt and underwear. We slept together that night. He tried to have sexual intercourse with me. We slept there until morning—got up about six o'clock, went to the car, got some water for it from the windmill and started south to Webster to learn the directions, and then on to Zurich. The roads were bad—we had quite a bit of trouble and were pulled out once or twice. We went on from there. The second night we stayed five miles east of Ellis. I don't know the man's name. He was single. I don't know whether Mr. Dusin knew him or not. We slept in the kitchen that night on a folding cot. We were the only ones in that room. We undressed the same as the night before and went to bed together. . . . We had intercourse. We got up about eight o'clock and went on through Yosemento and waited for gas until three o'clock and went on to Hays. Did not stop there. Went on south about six miles. My father overtook us. The officers from Hays was with him. I saw a gun which Mr. Dusin had, and he gave it to me. It was a pistol and loaded. We had a conversation at that time in which he said if we were caught he wanted to take all the blame. Said he would probably go to the pen and me to the reform school. When father caught up with us we got in the car and went back to Hays. That was about midnight. We left Hays in the night. We didn't stop for meals—had lunch in a large cracker box with us. It contained sandwiches, doughnuts, cake and apples. He said his sister, Martha Gundle, fixed it. I had not asked my father or mother to go with Mr. Dusin on this trip. He had asked my parents to take me to a show. He asked me to go, and I said he would have to ask my mother, and she said she was not my boss, to ask my father, and he said I could not go. I was not permitted to go with him."

Practically the only question presented is whether the evidence was sufficient to sustain the conviction. The defendant contends that he had no guilty intent; that they eloped for the purpose of getting married. The state contends that defendant's purpose was to get the girl away to use her as a concubine. The statute reads:

"Every person who shall take away any female, under the age of eighteen years, from her father, mother, guardian, or other person having legal charge

of her person, without their consent, either for the purpose of prostitution or concubinage, shall upon conviction thereof be punished by confinement and hard labor for a term not exceeding five years." (R. S. 21-428.)

The question was considered in *State v. Tucker*, 72 Kan. 481, 84 Pac. 126. In the opinion it was said:

"Concubinage, as used in the section quoted, had no settled common-law meaning. (*The People v. Bristol*, 23 Mich. 118, 127; *The People v. Cummons*, 56 Mich. 544, 23 N. W. 215.) It must be understood in its ordinary or popular sense. (Gen. Stat. 1901, ¶ 7342.) According to Webster's International Dictionary it is 'the cohabiting of a man and woman who are not legally married; the state of being a concubine.' And a concubine is defined to be a 'woman who cohabits with a man without being his wife.' Bouvier's Law Dictionary defines concubinage as 'the act or practice of cohabiting in sexual commerce, without the authority of law or a legal marriage.' Otherwise stated, it is living together as married people do without being legally married. Anciently, concubinage was a state of marriage not sanctioned by law.

"Concubinage is not the crime of which the defendant was convicted. He was accused of taking Minnie Bishop away, without the consent of her parent or guardian, for the purpose of concubinage. The gist of this offense consists in the intent or purpose of the taking away. What the defendant actually did was more important as evidence of his purpose than as showing that a state of concubinage had already been established. Sexual intercourse is not essential to the commission of this offense—it is only evidence of the character of the cohabitation. (*State v. Bobbst*, 131 Mo. 328, 338, 32 S. W. 1149; *Henderson et al. v. The People*, 124 Ill. 607, 17 N. E. 68, 7 Am. St. Rep. 391.)" (p. 486.) (See, also, *State v. Bussey*, 58 Kan. 679, 50 Pac. 891; *State v. William*, 106 Kan. 778, 189 Pac. 906; *State v. Bobbst*, 131 Mo. 328, 32 S. W. 1149.)

In the instant case the defendant was charged with the taking away of Erma Morton for the purpose of concubinage. The jury were justified in concluding that was his purpose, which was directly within the prohibition of the statute, and the statute is controlling. The question needs no further elucidation, and we discern no error which would warrant a reversal.

The judgment is affirmed.